IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JEAN KIEHL, ) | CASE NO.  1:08 CV 763 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE DONALD C. NUGENT |
| ) | |
| UNIVERSITY HOSPITALS HEALTH ) | |
| SYSTEM – HEATHER HILL, INC., ) | |
| ) | |
| Defendants. ) | MEMORANDUM OPINION |
| ) | |

This matter is before the Court on Defendant, University Hospitals Health System - Heather Hill, Inc.'s ("University Hospitals") Motion for Summary Judgment. Plaintiff, Jean Kiehl, claims that University Hospitals failed to pay her for overtime as required under the Federal and Ohio wage/hour laws, and that she was fired in retaliation for protected activities in violation of state and federal laws.  For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

**Facts**[1]

The Plaintiff, Jean Kiehl, is a Caucasian woman. She was hired by University Hospitals in September of 2005 as a Hospital Services Representative. Her title later changed to "Community Relations Coordinator." (Kiehl Dep. 83). Kiehl's Offer Letter stated that she was to work 40 hours per week, 8:00 a.m. to 4:30 p.m., Monday through Friday. (Opp. Ex. 1). Ms. Kiehl was assigned to work at University Hospitals' Extended Campus at Heather Hill in Chardon, Ohio. Her role was to help fill vacancies at the Liberty and Dolan facilities which provide assisted living services. (Declaration of Linda Marshall ¶ 3).

The nature and extent of Ms. Kiehl's job responsibilities is contested between the parties, as is the amount of time Ms. Kiehl spent in furtherance of her job responsibilities. There is no dispute, that at least on occasion, Ms. Kiehl was required to work beyond the regular 8:00 to 4:30 working hours. In August of 2007, Ms. Kiehl's supervisor changed. The new supervisor, Linda Marshall is an African-American woman. Ms. Kiehl testified that both her job responsibilities and the working environment changed noticeably once Ms. Marshall started as her supervisor.

Ms. Kiehl stated that Ms. Marshall made negative comments to her on a daily basis, and berated her in front of other employees. (Kiehl Depo. at 153, 200). She further testified that Ms. Marshall repeatedly asked her to alter her sales or marketing approach with families in a manner that Ms. Kiehl believed was unethical. ( Kiehl Depo. at 173-176). On October 19, 2007, Ms. Marshall told Ms. Kiehl that she should either (1) quit; (2) take a new position in Admissions

---

[1] Except as otherwise cited, the factual summary is based on the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to Plaintiff, the non-moving party.

(still reporting to Ms. Marshall); or (3) take sales training from Ms. Marshall.  (Opp. Exhibit 3, ¶57; Opp. Exhibit 14).  Ms. Kiehl agreed to training classes, however, Ms. Marshall either cancelled or did not show up to three of the scheduled training meetings.  (Opp. Exhibit 3, ¶58; Opp. Exhibit 9; Phillips Depo. at 87).   On November 29, 2007, Ms. Marshall threatened to fire Kiehl because she refused to use the sales/marketing approach preferred by Ms. Marshall and because the census/vacancy rate had not improved at the facility(ies).  Ms. Marshall offered Ms. Kiehl the possibility of severance pay if she would resign.  (Ex. 3, ¶¶60, 64; Ex. 5, Kiehl Depo. at 238-240).  On November 30, 2007, Ms. Kiehl met with UH's Human Resource Manager, Danialle Lynce and Ms. Marshall; they offered to put together a severance package for her if she agreed to resign.  (Opp. Ex. 3 ¶68; Kiehl Depo. at 232, 246, 256).  Ms. Kiehl agreed to consider an offer and the parties agreed to meet again on December 3, 2007.  (Opp. Ex. 3, ¶69; Kiehl Depo. at 256).  That evening Ms. Kiehl made two calls to UH's Integrity Hotline.  She told the Hotline operator that (1) she was threatened with termination; (2) she was offered a severance package if she resigned; (3) she felt that she was not being treated fairly by her supervisor Ms. Marshall; and (4) that she had a "flawless" performance record and had received a $1.50 raise the year before.

On December 3, 2007, after the calls to the hotline were made, but before investigation of Ms. Kiehl's complaints were completed, Ms. Kiehl was placed on paid administrative leave pending the outcome of the investigation.  (Lynce Depo. at 73-74).  On December 7, 2007, Ms. Kiehl was terminated; she was not offered any severance.

**Summary Judgment Standard**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could

find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## Analysis

I. <u>Counts One and Two:  Non-Payment of Overtime</u>

Plaintiff alleges that, she was not compensated for hours in excess of forty (40) per

week in violation of federal and Ohio state law.  Under section 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1)., and O.R.C. §4111.03(A) an employer is required to pay employees time and a half for all hours worked in excess of forty (40) per week.   Both the state and federal statutes, however, exempt "administrative" employees from the overtime requirements.  29 U.S.C. §213(a). [2]

The "administrative" exemption applies to employees whose primary duty is "the performance of work directly related to the management or general business operations of the employer or the employer's customers," and whose primary duties include the "exercise of discretion and independent judgment with respect to matters of significance."  29 U.S.C. §213(a); 29 C.F.R. § 541.200-202 (2006).    The employer has the burden of proving that the employee is exempt.  *Koppinger v. Am. Interiors, Inc*., 295 F.Supp.2d 797 (N.D. Ohio 2003)(citing *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997)).

Defendant claims that the Plaintiff was an "exempt" employee and was not entitled to overtime pay under the FLSA, and that even if she was not exempt there is no evidence that she worked more than forty (40) hours in any given week.  Plaintiff claims that she did not fit into the "administrative" exemption because her work was not directly related to the management or general business operations of the employer or its customers, and because she was not able to exercise discretion and independent judgment with respect to matters of significance.

Defendants argue that Ms. Kiehl's work was directly related to the management or general operations of her employer and/or its customers, in that she was in charge of marketing

---

[2] O.R.C. §4111.03(A) directs that the Ohio overtime requirements are subject to the same exemptions set forth in section 7 and section 13 of the FLSA.

and promoting sales for the two facilities at issue. Courts have routinely held that employees who market and promote sales fall within the administrative exemption, citing factors such as contact with customers, focus on sales goals, responsibility for informing customers about their products and providing demonstrations of a product to potential customers. *See, e.g., Reich v. John Alden Life Ins., Co.*, 126 F.3d 1, 10 (1st Cir. 1997). Defendant further argues that in promulgating its current regulations, the Department of Labor has specifically adopted the reasoning in *John Alden* and takes the position that employees who engage in marketing and sales promotion work should be evaluated under the standards set forth by the First Circuit in that case. See, April 23, 2004 preamble to Department of Labor's Final Rule, 29 C.F.R. §541 at 22145-6.

Ms. Kiehl contends that her duties were more sales oriented or clerical in nature. She cites *Heidtman v. The City of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999) and C.F.R. §541.205(a), for the proposition that sales jobs are not exempt from FLSA coverage, and *Mando v. Realty Group*, 207 WL 1725414 (S.D. Miss. 2007) for the proposition that clerical jobs are not exempt. There is evidence that Ms. Kiehl may have performed marketing, sales, clerical and/or other job duties during the course of her employment at UH, and there is further evidence that the type of work she performed changed from time to time during the course of her employment. There remains a question of fact for the jury to determine which duties predominated during which periods of her employment with the Defendant, and consequently whether the exemption applied during all or part of her tenure with the Defendant.

There is also a dispute of fact as to whether Ms. Kiehl satisfied the second requirement of the exemption during any or all portions of her time working for the Defendant. Although there

are indications in the testimony that her level of independence varied depending on the supervisor in control at the time, there remains a question of fact as what level of discretion and independence she was able to exercise during the course of her employment.  Ms. Kiehl has put forth evidence that could support a finding that she had no ability to exercise discretion or independent judgment on many of the issues critical to her work.  In fact, a jury could find that it was her attempt to do so, while under the supervision of Ms. Marshall, that arguably led to her termination.   On the other hand, the Defendants have also produced evidence which would allow them to argue that during some or all of her employment, Ms. Kiehl exercised a great deal of independence and discretion over significant matters.

Finally Defendant claims that Ms. Kiehl has failed to show that she ever worked in excess of forty hours during any given week.  There is, however, clearly a question of fact on this issue.  Plaintiff has provided testimony through her deposition, her affidavit, and the testimony of other witnesses that would tend to show that she sometimes worked in excess of forty hours a week.  The Defendant has presented testimony to the contrary.  Therefore, there remains a question of material fact for the jury to decide on this issue.[3]  Because questions of fact remain as to the predominate type of duties Ms. Kiehl performed during the course of her employment, the amount of discretion and independent judgment she was expected to exercise,

---

[3] Part of the evidence submitted by the Plaintiff in opposition to the Defendant's Motion for Summary Judgment was presented by way of Ms. Kiehl's Affidavit.  Defendant  filed a motion to exclude this affidavit on the grounds that it contradicts her deposition testimony. (ECF #37).  Although there are some comments that are potentially contradictory between certain portions of the cited deposition and her affidavit, the contradictions are not so black and white as to warrant exclusion of the affidavit.  A better means of addressing these potential conflicts is to allow the parties to explore the issues and seek reconciliation (or repudiation) of the statements at issue during direct and/or cross examination at trial.

and the number of hours she worked in any given week, summary judgment on these claims is not appropriate.

II. Count Three: Retaliation

The Plaintiff alleges that she was terminated in retaliation for protected activity in violation of the anti-retaliation and discrimination provisions of O.R.C. §4112.02, and/or Title VII. In order to maintain a Title VII claim, a plaintiff must file a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory and/or retaliatory conduct. See, 42 U.S.C. § 2000e-5(F)(1). Plaintiff does not dispute that she failed to file any such charge. This Court, therefore, lacks subject matter jurisdiction to hear the retaliation claim arising under Title VII because the Plaintiff failed to exhaust her administrative remedies. *Strous v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). The Court, however, will review Plaintiff's retaliation claim under state law.

The Supreme Court of Ohio has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, is generally applicable to cases involving alleged violations of OHIO REV. CODE ANN. § 4112." *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981). Thus, the Court's consideration of federal case law applies equally to Plaintiff's state claims and any federal Title VII claims that may have been fairly in the Complaint. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (stating that the district court correctly "lumped together" plaintiff's Title VII and Ohio state law theories of discrimination).

To establish a claim of retaliation under Ohio law, the plaintiff must establish a prima facie case, showing that: (1) she engaged in activity protected by O.R.C. Chapter 4112; (2) the

-10-

exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between plaintiff's protected activity and the adverse action.  *Hampel v. Food Ingredients Specialties,* 89 Ohio St.3d 169, 175 (2000).; *see also*, *Allen v. Michigan Department of Corrections,* 165 F.3d 405, 411 (6th Cir. 1999); *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991).  If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.  If the defendant comes forward with such a reason and rebuts the prima facie case, the plaintiff must then establish that the nondiscriminatory reason articulated by the defendant was a mere pretext for the alleged discriminatory action.  *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 374 (6th Cir. 1984); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The plaintiff bears the burden of persuasion throughout the entire process.  In this case, Plaintiff has produced no evidence that would satisfy her burden of proving the initial elements of a retaliation claim under O.R.C. Chapter 4112.

   A.  <u>Protected Activity</u>.

General complaints of unfair treatment not stemming from racial animus or some other form of discrimination are not protected activity under O.R.C. Chapter 4112.  *Lockett v. Marsh*, No. 1:06 CV 00035, 2007 U.S. Dist. LEXIS 73939, *35 (N.D. Ohio Oct. 3, 2007); *Felts v. Ohio Dep't of Rehab. & Corr.*, No. 2007-03552, 2008 Ohio 4797, 2008 Ohio Misc. LEXIS 208 (Ohio Ct. Cl. Aug. 27, 2008).  Plaintiff offered no facts in her Complaint that would have indicated that she believed she suffered adverse employment actions, or was otherwise being singled out or

harassed by Ms. Marshall on the basis of her race.  The only reference to race in the entire Complaint is a statement averring that Ms. Marshall is an "African- American female."   The Complaint does not make any allegation as to the race of the Plaintiff.  It baldly asserts that Ms. Kiehl is a member of a protected class, and though it is peppered with the word "discrimination," absent is any explanation or description of the type of discrimination Plaintiff is claiming.   The Complaint could just as easily be construed as a charge of sex, religious, disability, or age discrimination, as it could be construed as a charge of race discrimination.

Further, Plaintiff provided no information during her deposition to support a claim that she believed she had been discriminated against on the basis of her race, or that she ever informed anyone at UH that she held such a belief.  She was questioned extensively about the basis for her claims; she was specifically asked about the "hotline" calls she made when she felt that termination was imminent; she reviewed notes and transcripts from her first two calls and indicated that she remembered nothing that was left out or missing from those notes; she indicated that she had called back at later dates to provide additional detail but made no reference to having made an additional allegation of race discrimination at that time.  Neither side has cited to anything in her deposition testimony that would lead any reasonable person to believe that she either felt or complained of race discrimination by her employer.

The testimony clearly indicates that Ms. Kiehl believed that she was being harassed and singled out by Ms. Marshall; that they had different ideas of how best to perform her job; and that there was clearly a personality conflict between her and her new supervisor.  There was, however, no indication anywhere in any of the cited deposition transcripts or exhibits of any discrimination based on race or any other protected classification.  Nor was there any indication in any of the

deposition transcripts submitted in this case, or any accompanying exhibits that Ms. Kiehl ever complained to UH of race discrimination or discrimination based on any other protected classification.

For the first time, in Plaintiff's Brief in Opposition, Ms. Kiehl submitted an affidavit stating that during the hotline calls she said that she was "not being treated fairly by my supervisor Marshall who is black" and she "suggested that Marshall's race was a factor."[4] (Kiehl Aff. ¶ 72). Even accepting as true that Ms. Kiehl may have "suggested that Marshall's race was a factor" in some subsequent call to the hotline, this may not be enough to establish protected activity under O.R.C. Chapter 4112.  This vague assertion does not make clear how this "suggestion" was communicated, and there is no evidence whatsoever that the hotline investigator, Ms. Marshall or Ms. Lynce would have reasonably understood that Ms. Kiehl was making a complaint of race discrimination in exercise of her rights under O.R.C. §4112.02.  If

---

[4] Defendant filed a motion to exclude this portion of Ms. Kiehl's affidavit on the grounds that it contradicts her deposition testimony. (ECF #37).  Although it is a very close call, the Court denies the motion as to paragraphs 72 and 73 of the affidavit.  Assuming that Ms. Kiehl made the "suggestion" that race may have been a factor in Ms. Kiehl's allegation appears to be that she added the alleged comments about race in a follow up call to the hotline sometime after her original 2 calls, it is true that Defendants did not ask the specific question that may have led to the averment contained in paragraph 72 of the affidavit.  The specific questioning relating to the hotline call during her deposition was limited to the notes and transcripts of the original call and one follow up call on the same night.  However, one should certainly be able to expect that a Plaintiff, when being deposed about the events leading to her claim, would provide at least a minimal amount of information pertaining to the basis for her claim.  The Defendants' questions fairly raised the issue of the reason for her hotline call and clearly were aimed at discovering why Ms. Kiehl believed that she had been terminated.  A failure to raise the issue of race when given this opportunity to explain the basis for her lawsuit leads could suggest that either racial discrimination was not a real issue in Ms. Kiehl's mind, or she was engaging in some kind of obfuscation meant to mislead the Defendants and inject unnecessary cost and effort into their defense of this matter.

Ms. Kiehl did make clear that she believed Ms. Marshall's race somehow was a factor in their apparent inability to work together, or in Ms. Marshall's alleged personal animosity towards Ms. Kiehl, this may not rise to the level of expressing an opposition to an "unlawful discriminatory practice" by UH to discriminate on the basis of race, or "making a charge ... in [an] investigation, proceeding or hearing under sections 4112.01 to 4112.07 of the Revised Code." O.R.C. § 4112.02(I); *see*, *Osaze v. City of Strongsville*, 2006 Ohio App. LEXIS 983, 2006 Ohio 1089 (2006)(holding a complaint of discriminatory conduct by coworkers did not amount to an opposition of discriminatory practices by the employer, nor did it equate to a charge or participation in an investigation or proceeding under O.R.C. 4112).  However, even if this "suggestion" did rise to the level of protected activity, Ms. Kiehl's retaliation claim would fail because she cannot establish a causal connection between this activity and any adverse employment action.

  B. <u>Employer's Knowledge of the Protected Action</u>

  The evidence from the deposition transcripts shows that Ms. Lynce and Ms. Marshall became aware of the hotline calls on December 3, 2007.  (Lynce Depo. 72-75).  The final decision to terminate Ms. Kiehl was made on December 6, 2007, after the hotline investigation was completed, and was communicated to Ms. Kiehl the following day.  (Lynce Depo. 69, 114-115). However, there is no evidence to suggest that Ms. Lynce or Ms. Marshall were aware of any claims of race discrimination made in connection with the hotline calls.  As discussed above, although Ms. Kiehl claims to have "suggested" that race might be a factor in Ms. Marshall's treatment of her when she called the hotline, there is no evidence of exactly what Ms. Kiehl's "suggestion" involved, or how it was communicated, therefore, there is no way to establish that

the hotline operator (or any other reasonable person under the circumstances) would have understood Ms. KIEHL's "suggestion" was raising a complaint of race discrimination. Further, even if the "suggestion" were sufficiently communicated to the hotline operator, there is no evidence that the "suggestion" was memorialized and/or communicated to the investigator, Ms. Marshall, Ms. Lynce, or anyone else involved in the decision to terminate Ms. Kiehl.

### C. Adverse Employment Action

Although termination is, without doubt, an adverse employment action, Plaintiff also claims that the failure to offer a severance package upon her termination also serves as an adverse employment action. The failure to pay severance not otherwise owed or specifically promised does not amount to an adverse action in a retaliation case because it is not a benefit given or owed to similarly situated employees. *Equal Employment Opportunity Commission v. Sundance Rehabilitation Corp.*, 466 F.3d 490 (6th Cir. 2006). There is no evidence that the Defendant owed or promised Ms. Kiehl a specific severance package, or that other employees in her situation were provided with severance packages. The fact that the possibility of severance was being explored in exchange for her voluntary resignation (before any hotline calls were made) does not establish that Plaintiff was owed or promised a severance upon her termination.

### D. Causal Connection Between Protected Activity and Adverse Action

Even if Plaintiff could show that her hotline call supposedly "suggesting" that race may have been an issue in Ms. Marshall's desire to terminate her employment constituted protected activity, she cannot establish that this activity caused her termination. It is clear that Ms. Marshall wanted to terminated Ms. Kiehl prior any alleged protected activity. In fact, it was this clear intent or desire on Ms. Marshall's part that led Ms. Kiehl to make the hotline calls that she

-15-

claims constituted protected activity.  Although Ms. Lynce testified that the final decision to terminated Ms. Kiehl did not occur until after the hotline call was placed, she had been asked to resign prior to that date, Ms. Marshall had clearly indicated her desire to terminate Ms. Kiehl prior to that date, and Ms. Lynce, a human resources officer, had already been called in to discuss the possibility on more than one occasion prior to that date.   There is an abundance of evidence to show that Ms. Lynce was aware of a problem between Ms. Marshall and Ms. Kiehl, and that Ms. Kiehl had, on several occasions, communicated her side of the issues to Ms. Lynce, never once mentioning the possibility that racial discrimination was an issue or even a possibility.  Further, there is evidence the Ms. Kiehl refused to the follow directives of Ms. Marshall, her manager, and that she made no attempt to hide this fact from Ms. Lynce during their discussions of the issue.  Finally, there is absolutely no evidence that Ms. Lynce was aware that Ms. Kiehl had made allegations of racial discrimination prior when she made the official determination to terminate her.   Therefore, because Ms. Marshall had communicated her intent to have Ms. Kiehl fired before any alleged protected activity occurred, because Ms. Lynce had taken steps toward having Ms. Kiehl removed from her position (by requesting a voluntary resignation, and exploring other options to remove Ms. Kiehl from her position) prior to any alleged protected activity, and because there is absolutely no evidence that Ms. Lynce was aware of any claim of racial discrimination when the decision to terminate Ms. Kiehl was made, Plaintiff cannot establish causation and her retaliation claim must fail.   Defendant's Motion for Summary Judgment on Count Three is, therefore, granted.

III. Count Four: Violation of Public Policy

  Ohio recognizes a tort action for wrongful termination in contravention of public policy.

*Greeley v. Miami Valley Maintenance Contr., Inc.*, 49 Ohio St.3d 228 (1990). To establish a claim, an at-will employee must establish, among other things, that the dismissal was motivated by conduct related to a clear public policy that is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law. Count Four of Plaintiff's Complaint states that she was terminated in violation of the public policy against discrimination and retaliation (presumptively in contravention of Title VII or O.R.C. §4112). Ms. Kiehl has offered absolutely no evidence or argument that she suffered actual discrimination on the basis of race or any other protected classification, and, as set forth above, her claim for retaliation cannot survive summary judgment. There is, therefore, no evidence of a termination in violation of public policy, and Defendant's Motion for Summary Judgment on Count Four must be granted.

## Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (ECF #32) is GRANTED in part and DENIED in part. Plaintiff's Claims for Retaliation and Violation of Public Policy(Counts Three and Four) are hereby dismissed. Defendant's Motion to Exclude Portions of Plaintiff's Affidavit That Contradict Her Deposition Testimony (ECF #37) is DENIED. IT IS SO ORDERED.

    /s/ Donald C. Nugent  
DONALD C. NUGENT  
United States District Judge

DATED: June 4, 2009